**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3594-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSEPH J. TALAFOUS, JR.,

     Defendant-Appellant.

_____

          Argued February 26, 2020 – Decided June 10, 2020

          Before Judges Koblitz, Whipple, and Gooden Brown.

          On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-05-0072.

          Gerald D. Miller argued the cause for appellant (Miller, Meyerson & Corbo, attorneys; Gerald D. Miller and Nirmalan Nagulendran, on the briefs).

          Evgeniya Sitnikova, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Evgeniya Sitnikova, of counsel and on the brief).

PER CURIAM

Defendant, Joseph J. Talafous, Jr., appeals from an April 10, 2018 judgment of conviction after a jury found him guilty of seventeen counts under an indictment charging money laundering, theft, misapplication of entrusted property, and failure to make lawful disposition, as well as tax fraud involving estate and trust funds of five clients and filing fraudulent tax returns. We affirm.

We discern the following facts from the trial record. In 1994, defendant began working as a lawyer in his father's law office in Jersey City. About five years later, after his father Joseph Talafous, Sr. retired, defendant continued the practice and represented clients in areas such as elder law and wills, trusts, and estates.

In 2013, the State began investigating defendant's legal practice after it received a referral from the Office of Attorney Ethics (OAE). Detective Scott Stevens of the Division of Criminal Justice subpoenaed defendant's attorney trust and business account records, as well as account records for Peter Pasinosky, the estate of Peter Pasinosky, the Jared Sherengo trust, and the estates of Mildred Colavito, Maria Matarazzo, and Michael Zaccaria.

The investigation resulted in defendant's indictment on nineteen counts relating to his theft of client funds and misreporting revenue on his tax returns, as follows:

Count One, first-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(b)(2)(a);

Counts Two, Five, and Eight, second-degree theft by unlawful taking, N.J.S.A. 2C:20-3, from, respectively, the Jared Sherengo trust, the estate of Mildred Colavito, and the estate of Michael Zaccaria;

Counts Three, Six, Nine, and Twelve, second-degree theft by failure to make required disposition of property, N.J.S.A. 2C:20-9, belonging to, respectively, the Jared Sherengo trust, the estate of Mildred Colavito, the estate of Michael Zaccaria, and the estate of Maria Matarazzo;

Counts Four, Seven, Ten, Thirteen, and Fifteen, second-degree misapplication of entrusted property, N.J.S.A. 2C:21-15, from, respectively, the Jared Sherengo trust, the estate of Mildred Colavito, the estate of Michael Zaccaria, the estate of Maria Matarazzo, and Peter Pasinosky and the estate of Peter Pasinosky;

Counts Eleven and Fourteen, second-degree theft by deception, N.J.S.A. 2C:20-4, from, respectively, the estate of Maria Matarazzo, and Peter Pasinosky and the estate of Peter Pasinosky; and

A-3594-17T2

Counts Sixteen, Seventeen, Eighteen, and Nineteen, third-degree filing false or fraudulent gross income tax returns, for tax years 2011, 2012, 2013, and 2014, N.J.S.A. 54:52-10.

Defendant moved to dismiss various counts of the indictment, and on October 13, 2016, the court heard argument and granted the motion in part, dismissing count one and not the remaining counts.

On June 13, 2017, we affirmed dismissal of the first count of the indictment on the State's interlocutory appeal. State v. Talafous, No. A-1838-16 (App. Div. June 13, 2017).

## Pasinosky

Peter Pasinosky[1] was blind most of his life and operated a newsstand at the courthouse in Hackensack. While working at the courthouse, Peter met defendant's father, who he retained to draft a will. The will designated Joseph J. Talafous, Sr., as co-executor of the will, along with Peter's nephew, John Pasinosky. John testified he moved from New Jersey to California in the mid-1990s, but remained in contact with his uncle.

---

[1] We use first names where the last names are the same for ease of reference, in doing so we mean no disrespect.

A-3594-17T2

In March 2007, John traveled to New Jersey to move Peter into a senior living facility. While in New Jersey, John reviewed his uncle's will and saw that it was written by an attorney named Joseph Talafous. Since John did not know any other attorneys who could handle the necessary financial arrangements for his uncle, he called defendant and spoke with him on at least two occasions.

John explained that his uncle had a complicated financial portfolio, amounting to between $400,000 and $450,000. Since the senior living facility required a down payment of $170,000 to move in, Peter needed someone to act as his power of attorney to liquidate some of his assets and make the required payment. Peter appointed defendant to serve as his power of attorney, executing the requisite form on March 2, 2007. Thereafter, Peter completed the necessary paperwork for admission to the senior living facility in the presence of one of his relatives and defendant.

John also took Peter to Hudson City Savings Bank and added himself as a joint owner of Peter's bank account to assist Peter with the payments of his monthly bills–a phone bill and a maintenance fee. As joint owner of the bank account, John paid these bills for his uncle, because he did not believe it was worth the expense to have defendant pay the bills.

Thereafter, defendant periodically visited Peter whenever Peter called him with an issue. Defendant's office assistant, Lizette Vazquez, went to the senior living facility with defendant on two or three occasions but never prepared a bill for any of defendant's visits. Instead, defendant claimed that Peter agreed to pay him a $10,000 yearly retainer during the last few years of his life.

During a visit in August 2008, John asked Peter for a loan of $14,000 to pay his daughter's tuition bill. Peter approved the loan while defendant drafted the necessary documents and had John sign a promissory note and mortgage. Defendant transferred the loan money from Peter's account to his attorney trust account, and then issued the loan check to John from his attorney trust account.

In March 2009, defendant requested that John repay the loan, after learning John sold the property that was used as collateral for the loan. In repaying the loan, John wrote a check and deposited it into his uncle's Hudson City Savings Bank account. Defendant informed John that this was improper, and made John send the check directly to him.

According to Vazquez, defendant charged Peter $10,000 for his efforts in drafting the loan documents and obtaining repayment of the loan. However, there is no documentation of the time defendant spent performing these acts,

6

because defendant never prepared any bills for his work for Peter, either before or after his death.

Peter resided in the senior living facility for three years until he was hospitalized in February 2010.  During Peter's hospitalization, John spoke with defendant and told him Peter did not have long to live.  Defendant then made two withdrawals from Peter's account, the first on March 2 and the second on March 5, 2010.  On March 10, 2010, Peter died.

Two weeks after Peter's death, on March 25, 2010, John flew to New Jersey to coordinate with defendant to address mortuary services and estate issues in accordance with the instructions Peter had written during his lifetime.  Prior to John's arrival, defendant arranged for the cremation of Peter's remains.  According to John, Peter had already paid for a tombstone and the cost of cremation prior to his death; Vazquez, however, testified that defendant arranged for payment to the monument company.  John further testified he and his sister arranged for the burial of Peter's remains.

While in New Jersey, John met with defendant three times, and went with him to Surrogate Court to complete paperwork.  John knew Peter's will named defendant's father as co-executor of Peter's will; however, defendant informed him that he bought out his father's business, and the law firm was transferred to

him. John interpreted this information to mean defendant inherited the role of co-executor of Peter's will when he took over the law firm.

Defendant maintained that John agreed for him to serve as co-executor, knowing it was his father, Joseph Talafous, Sr., who was named as co-executor in the will. Defendant also maintained that he orally informed the Hudson County Surrogate that the will named his father as co-executor, and not him. Nevertheless, the Surrogate signed the paperwork, approving him to serve as co-executor.

Linda Baisden, the Deputy Surrogate of Hudson County, disputed defendant's statements. She testified to her understanding that defendant, not his father, was the named co-executor in Peter's will. She further testified defendant swore under oath that he was the named co-executor. She stated that she did not compare signatures, or otherwise notice that defendant's signature, on the probate documents, did not match the signature of the Joseph Talafous on the will.

Detective Stevens testified that defendant made multiple withdrawals from Peter's account in the interim between Peter's death, when the power of attorney was no longer valid, and the time when defendant was named co-executor of the estate.

Before John returned to California, defendant gave him a retainer agreement to sign. However, John never signed the agreement because there were no rates included in it. Defendant asserted that, as co-executor, John received statements from Peter's estate account, which was with Morgan Stanley. Defendant claimed he kept John apprised of the work that he was doing for the estate, including bills he was paying out of the estate account. He also claimed he told John he needed to be compensated for the legal work he was performing. Defendant admitted, however, that John never approved of any withdrawals from the estate account to compensate defendant for his legal fees.

John testified it was not until March 2011, about a year after his uncle's death, that he began receiving statements for his uncle's estate account with Morgan Stanley. He stated that he only began receiving the statements after he made a specific request for them. He further testified that in reviewing his uncle's account statements from before his uncle's death, the time when defendant controlled the accounts as power of attorney, he noticed periodic withdrawals of between $5000 and $10,000. He testified he did not know what this money was used for, or where it had been transferred.

John provided Peter's accountant with his uncle's financial information and asked the accountant to prepare his uncle's tax returns. According to John,

defendant "got very upset" when he did this, and insisted he retrieve the documents John sent to the accountant and have defendant's "tax people" handle Peter's taxes. On multiple occasions, John asked defendant to provide an accounting of Peter's assets, including bank accounts and insurance policies, identify any distributions made from those assets, and provide a bill for his legal and co-executor services. Defendant never provided such an accounting. John hired an attorney to assist him.

In June 2011, defendant provided John with a certification of services. John reviewed the certification and noted numerous overcharges, as well as inaccuracies; the certification recorded the 2008 loan to him as an expense and did not indicate that the loan had been repaid. John testified he never authorized defendant to withdraw any money from the estate in order to pay his attorney fees. Defendant admitted that he took attorney fees out of the estate without providing a written bill or a signed retainer agreement.

Detective Stevens testified defendant made withdrawals from Peter's estate account after defendant became co-executor of the estate. Detective Stevens also testified that, in total, both during Peter's lifetime and after his death, defendant withdrew $96,020.23 from Peter's accounts, and used only

$2,251.69 for Peter's benefit, while $93,768.54 was transferred to defendant's accounts.

## Matarazzo

Maria Matarazzo lived in Manhattan, on Central Park South, and owned and operated a hair salon on Madison Avenue. She also had an online business and sold a line of beauty products. Maria died on May 24, 2012 leaving an estate valued at $4.3 million. Maria's will, dated 1984, designated her brother as executor. However, her brother predeceased her, therefore, Gary Matarazzo, Maria's nephew, served as the executor with defendant sending renunciations to other beneficiaries. Gary had known defendant for approximately ten to fifteen years, and retained defendant's father to do legal work in the past.

Gary engaged defendant to handle every aspect of Maria's estate, except the sale of her apartment. Although Gary stated he only entered a verbal agreement with defendant, a written retainer agreement, presented at trial, contained Gary's signature. Gary, however, testified he never saw the document until shortly before trial. The agreement set forth a rate of $350 per hour, but Gary denied any agreement to pay that amount. Defendant never sent Gary a bill describing the work he performed for the estate. Moreover, Vazquez

A-3594-17T2

testified that when defendant's office closed, he had not completed work on the estate and no accounting was prepared.

Although the record is unclear as to what work defendant performed, Gary knew defendant created a New Jersey corporation to take over Maria's hair salon, with Gary named as the president of the corporation. Defendant also went with Gary to New York a few times, to address a problem with respect to paychecks at the salon and to convert the salon's bank accounts to estate accounts. According to Vazquez, Gary came to the office at least once per week.

The record reflects, however, that without telling Gary, defendant hired another attorney, John Walsh, to handle all New York aspects of administering the Matarazzo estate. Walsh was admitted to practice in New York, the location of Maria's estate, whereas defendant was not. Walsh testified that he began working on the estate in the fall of 2011 and acknowledged he had difficulty obtaining necessary documents and information from defendant for approximately two years. Walsh ultimately took over the administration of the estate in October 2014. In total, Walsh billed defendant for 33.4 hours of work through October 2014, and defendant paid him about $8000. Walsh's billing rate was $425 per hour, and he billed for his paralegal's time at $160 per hour.

Defendant periodically asked Gary for payments. Gary paid the amounts defendant requested, out of the estate account, believing the payments were for legal fees relating to the estate. The total amount Gary paid defendant for the estate work was over $300,000. Gary denied approving any loans to defendant.

<u>Sherengo</u>

Diana Aponte is the mother of Jared Sherengo, who was seventeen years old at the time of defendant's trial. They lived in an apartment in West New York, along with Jared's three siblings. When Jared was ten months old, his father died in a work-related construction accident. The family obtained a consent judgment in workers' compensation court. In August 2005, a court awarded Jared fifty percent of the settlement proceeds, amounting to $461,881.74, in a separate litigation for damages relating to his father's death. Defendant's firm represented Jared in the workers' compensation case and represented Jared solely at the settlement hearing in the other litigation.

The consent judgment in the workers compensation matter reflects defendant's counsel fee as $1000. Regarding the other litigation, Aponte never discussed with defendant the method of payment, but when that case settled, defendant told her he had not yet been paid for his work.

13

The court ordered Jared's settlement money be placed in a trust, and appointed defendant to act as trustee, with Aponte's consent. Aponte agreed to this arrangement because she trusted defendant. Defendant established a special needs trust for Sherengo with Morgan Stanley; however, Aponte testified that Jared does not have any special needs and she never told defendant that he did.

When defendant created the trust account, he deposited only $400,000 of the $461,881.74 settlement monies into the account. Vazquez could not recall where the additional money was deposited, or whether it was reported as fee income. Thereafter, as trustee, defendant had sole authority to authorize transactions on the trust account.

Aponte testified she initially received a $2500 check for Jared from Morgan Stanley. After that, whenever she needed money, she would call defendant's office, and then travel to the office to sign paperwork regarding any payment made to her. Aponte testified that she generally asked for money twice per year, but sometimes made more frequent requests. Vazquez, however, testified that Aponte came to the office more frequently, four or five times per year.

In terms of the work defendant did with respect to the Sherengo trust, Aponte testified that in the beginning, she would give defendant receipts to show

how she spent the money. However, at some point she stopped doing that. Vazquez testified defendant managed the trust account, inquired about Jared's schooling, and sometimes visited Aponte's apartment to check on Jared's living arrangements.

Defendant told Aponte the trust money could be used only for Jared, and generally gave her the money she requested. However, on one occasion, she asked for money to purchase a vehicle, which she needed to take Jared to school and to the doctor, and defendant rejected her request. On two other occasions, when she told defendant Jared needed computers for school, defendant purchased the computers and brought them to Aponte's home, rather than giving Aponte the money to make the purchases herself.

Defendant never submitted a bill for his services or gave Aponte an accounting of the money in the trust. Instead, he discouraged Aponte from considering Jared's financial security. He also never asked Aponte to authorize his fees, nor did he seek approval for payment of his fees from the trust. According to Aponte, she never asked to review the account statements for the trust, and never knew defendant was taking money from the trust account other than what was given to her for Jared's needs. However, Vazquez claimed that on one occasion, defendant provided Aponte with copies of the trust's account

15

statements. Vazquez also testified that she spoke to Aponte about the need to pay defendant for his services, although she admitted that she never gave Aponte any written notice of defendant's withdrawals from the trust account.

The record reflects defendant made numerous withdrawals from the trust account, with the money sent to defendant's attorney trust or business accounts. Anthony Cristiano of Morgan Stanley testified to the specific withdrawals.

Defendant told OAE that all of the funds he withdrew from the Sherengo trust account and deposited into his accounts were disbursed solely for Jared's benefit and with Aponte's approval. However, he also admitted he had taken money for legal fees, particularly in relation to Aponte's requests for funds. Detective Stevens testified that of the $400,000 initially placed into Jared's trust account, only $35,000 was withdrawn and paid to Aponte to use for Jared's benefit, whereas $400,000 was transferred either to defendant's business or trust account.

Colavito

Mildred Colavito lived in Jersey City across the street from defendant's law office. She died on August 14, 2009, after which her nephew, Dr. Anthony Conte, traveled to New Jersey from Florida in order to make funeral arrangements. While in New Jersey, Conte visited defendant.

16

Defendant prepared Colavito's will in 2001, and was named executor of the will. After Colavito's death, defendant took possession of a metal box of currency that the police found in her apartment, and Vazquez signed a police inventory of the contents of the apartment. Later, defendant also arranged for the apartment to be cleaned out.

In her will, Colavito made at least nineteen specific distributions to named beneficiaries, including Conte. Thereafter, percentages of the balance of her estate were bequeathed to various charities, and the residue was bequeathed to Conte. Vazquez testified that defendant notified all of the beneficiaries of the will and sent them checks for the amounts bequeathed to them. However, neither Vazquez nor Conte recall any disbursements from the estate to charitable organizations.

Moreover, Conte testified that he did not receive the amounts bequeathed to him. He was specifically bequeathed $5000, another $5000 for expenses, plus the residue of the estate. Conte, however, received only $1691.10 for expenses, and could not verify having received the additional $5000, nor any amount representing the residue of the estate. Conte never saw any bills for defendant's work with respect to the estate and was not aware of any monies taken by defendant from the estate for legal or executor fees.

Vazquez could not recall preparing any bills or accounting for the Colavito estate and testified the estate was not complete when defendant's office closed. Nevertheless, between February 2011 and February 2014, the Colavito estate bank account had a balance of just $596.55. In March 2014, the balance on the bank account was zero, with a check for $596.55 having been made out to Matthew Cantwell, an attorney who worked in defendant's office on January 17, 2014.

The record does not contain the documentation establishing how much money defendant received from the Colavito estate. The indictment alleged defendant stole $316,275.23.

Zaccaria

Michael Zaccaria worked in railway transit and owned and operated an iron business. Defendant performed legal services for Michael's business, and handled some personal matters for members of his family. According to Vazquez, defendant was not paid for all of his services at the time of Michael's death in June 2012. However, no documentation existed to establish what work defendant had performed on those matters, or what defendant allegedly was owed because defendant never prepared bills. Instead, he would advise Michael of the amount owed, and Michael would pay that amount.

Michael's wife, Delores Zaccaria, was the named executor of his will. Delores and her son Thomas Zaccaria hired defendant to assist in collecting on Michael's insurance policies, and in settling his estate. At the first meeting with defendant, Thomas paid defendant a fee of $10,000. However, both Delores and Thomas testified that they did not sign a retainer agreement at this meeting, nor did they discuss how much defendant would charge.

Although there is a retainer agreement, dated June 27, 2012, between defendant, Delores, and Thomas, it was not signed until April 30, 2013, the date defendant turned the document over to State investigators. Defendant admitted there was no retainer agreement in place before that date. Moreover, while the retainer agreement indicated that defendant would be paid $350 per hour, plus six percent of any insurance monies recovered, Thomas did not recall ever seeing those provisions, and testified that he never discussed these amounts with defendant, nor agreed to an amount of legal fees that defendant would charge.

Defendant never prepared any bills nor did he produce any accounting for the Zaccaria estate. Vazquez testified that although defendant was able to obtain payments on certain life insurance policies, the estate work was not complete at the time defendant's office closed. Nevertheless, at various times defendant removed money from the estate and deposited that money into his own accounts.

19

Regarding the life insurance proceeds, Delores testified she never directly received the insurance money. Rather, she visited defendant's office, signed the checks, and Vazquez gave her copies of the checks. In addition, although the record reflects two life insurance checks were made out to Delores, they were never endorsed by her. Instead, they were endorsed by defendant and deposited into his attorney trust account.

Delores did not know the total amount defendant was able to recover from her husband's life insurance policies and was unaware of any money she had not received. However, Thomas, after reviewing the multiple insurance check amounts with the prosecutor during his testimony, stated that they amounted to roughly $870,000.

Both Delores and Thomas acknowledged that defendant deposited a check in Delores's account for $400,000. Moreover, Delores testified she received additional amounts when she made specific requests to defendant for money to pay for a new roof or car repairs. She also authorized defendant to pay her husband's funeral expenses, and to make certain payments to her children. Both Delores and Thomas testified, however, that Delores did not receive funds for other requests made by her. They also testified they did not authorize defendant

20

to use any of the estate money to pay any fees.  Thomas further testified that he never made any loans to defendant.

### Tax Fraud

Defendant retained Alan Margulies, of Margulies, Englehart & Veneziale, to prepare his income tax returns and payroll tax returns.  Margulies also prepared tax returns for various trusts and estates handled by defendant, including the Sherengo trust.

Vazquez would send Margulies a copy of the firm's QuickBooks file and other necessary documents to prepare the returns.  Thereafter, Margulies or his staff would communicate with defendant or his staff about the document received.  In 2013, Margulies questioned whether the following entries reflected fee income or loans:  $4000 estate of Colavito; $3000 estate of Colavito; $2200 Hurley Realty; $16,897.50 Hurley Realty; and $13,000 estate of Matarazzo. Defendant responded the entries were loans.  The loan designation would change defendant's reported gross income.

Defendant denied ever borrowing money from a client, loaning money to a client, or engaging in a business transaction with a client.  Vazquez also denied knowledge of any loans taken by defendant from Matarazzo, Zaccaria, or

Colavito. Moreover, Gary Matarazzo and Thomas Zaccaria denied ever loaning money to defendant.

Each year, Margulies prepared the tax returns and sent them for defendant's review. Only upon defendant's authorization would Margulies electronically file the returns.

Detective Stevens testified as to discrepancies between defendant's reported income on the various trust and estate accounts and the actual funds withdrawn from those accounts. Specifically:

- In 2011, defendant reported income of $21,050 on the Sherengo trust, but received $50,075 from the account.

- In 2012, defendant reported income of $9500 on the Sherengo trust, but received $13,000 from the account.

- In 2012, defendant declared income of $5500 on the Colavito account, but received $14,500 from the account.

- In 2012, defendant reported $5000 in income from the Matarazzo account, but received $20,000 from the account.

- In 2013, defendant reported income of $36,700 on the Matarazzo account, but received $118,063.11 from the account.

- In 2013, defendant reported income of $109,800 from the Zaccaria

account, but received $128,800 from the account.

- In 2014, defendant reported $78,925 in income from the Zaccaria account, but received $267,275.81.

At the close of the State's evidence, defendant moved to dismiss count fifteen of the indictment, as to Pasinosky and the Pasinosky estate, which charged him with second-degree misapplication of entrusted property, N.J.S.A. 2C:21-15. He argued that this charge was time-barred by the statute of limitations to the extent any alleged thefts occurred prior to Pasinosky's death. The court denied the motion.

Defendant also moved to dismiss count fourteen of the indictment, charging theft by deception, N.J.S.A. 2C:20-4, against Pasinosky and the Pasinosky estate. He maintained there was insufficient proof of deception but the court nevertheless denied the motion.

Defendant moved to dismiss the tax fraud counts (counts sixteen, seventeen, eighteen, and nineteen), for lack of proof that defendant signed the tax returns, which the court denied. Finally, defendant moved to dismiss the remaining counts of the indictment for insufficient evidence, which the court denied.

The court thoroughly instructed the jury as to their role as fact-finders, the elements of each offense, and what evidence they were and were not permitted to consider, including that they may not consider counsels' arguments as evidence. The jury found defendant guilty on all counts except count twelve, theft by failure to make required disposition of property as to the Matarazzo estate. With respect to counts fourteen and fifteen (respectively, theft by deception and misapplication of entrusted property as to Pasinosky and his estate), the jury found that the amount stolen was less than $75,000.

Defendant moved for a new trial. After hearing argument on February 16, the court entered an opinion and order denying the motion. On March 29, 2018, the court held a sentencing hearing and entered a judgment of conviction. The court sentenced defendant to an aggregate term of twenty-six years.

This appeal followed.

Defendant raises the following issues on appeal.

POINT I.

THE COURT PERMITTED A DETECTIVE NOT QUALIFIED AS AN EXPERT TO COMPARE BANK STATEMENTS AND TAX RETURNS AND GIVE AN OPINION ON WHAT HAD BEEN REMOVED FROM BANK ACCOUNTS AND WHAT WAS NOT REPORTED AS INCOME ON TAX RETURNS.

POINT II.

THE COURT'S CONDUCT OF THE TRIAL DEPRIVED THE DEFENDANT OF DUE PROCESS OF LAW.

(A)

THE COURT ADMITTED EVIDENCE WHEN THE SUPPLYING OF DISCOVERY GAVE INADEQUATE NOTICE TO THE DEFENDANT.

(B)

THE TRIAL COURT'S LACK OF UNDERSTANDING OF ELEMENTARY PRINCIPLES OF JURISPRUDENCE DEPRIVED THE DEFENDANT OF DUE PROCESS.

POINT III.

THE SENTENCE IMPOSED ON [DEFENDANT] WAS EXCESSIVE.

(A)

IMPOSING SIX CONSECUTIVE SENTENCES VIOLATED THE GENERAL RULE OF NOT IMPOSING MORE THAN TWO CONSECUTIVE SENTENCES.

(B)

SUCCESSIVE TERMS FOR DIFFERENT OFFENSES SHOULD NOT HAVE BEEN EQUAL TO PUNISHMENT FOR THE FIRST OFFENSE.

A-3594-17T2

POINT IV.

THE DEFENDANT'S CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE SINCE THE OPINION EVIDENCE OFFERED BY THE STATE SHOULD HAVE BEEN STRICKEN AND THE STATE FAILED TO PROVIDE ANY PROOF THAT [DEFENDANT'S] FEES WERE NOT REASONABLE FOR THE SERVICES THAT HE RENDERED.

POINT V.

THE ACQUITTAL ON ONE THEFT CHARGE (COUNT 12) AS TO THE ESTATE OF [MATARAZZO] BARRED CONVICTION OF OTHER THEFT CHARGES AS TO THE ESTATE OF [MATARAZZO] (COUNTS 11 AND 13) FOR THE SAME ACTS.

POINT VI.

THE THEFT BY DECEPTION COUNTS AS TO THE ESTATE OF [PASINOSKY] (COUNT 17) SHOULD HAVE BEEN DISMISSED.

(A)

ALL THE ALLEGED THEFTS FROM [PASINOSKY] HAD OCCURRED PRIOR [TO] THE EXPIRATION OF THE STATUTE OF LIMITATIONS.

POINT VII.

THE THEFT AND MISAPPLICATION OF FUNDS OFFENSES AGAINST [PASINOSKY] WERE NOT CONTINUOUS OFFENSES.

26

MISAPPLICATION OF ENTRUSTED PROPERTY IS
NOT A CONTINUOUS OFFENSE.

I.

Defendant first argues the court erred in permitting Detective Stevens to give expert accounting testimony without having the necessary qualifications to do so. Having fully reviewed Detective Steven's testimony, we conclude this argument is without merit.

Detective Stevens testified to information he gleaned from his review of the records. He identified amounts defendant withdrew from these accounts and deposited into his own accounts, as well as the amounts defendant paid to Aponte. Detective Stevens also testified to the amounts defendant took from various accounts in specified years, and the amounts defendant reported on his tax returns as income from these accounts during those years.

Detective Stevens did not testify defendant misappropriated or stole the amounts taken from the client's accounts, nor did he testify that defendant misrepresented his income on his tax returns. He merely reported the amounts set forth in the records.

We review the trial court's evidentiary ruling for an abuse of discretion, and do not reverse unless there has been a clear error of judgment. State v. Nantambu, 221 N.J. 390, 402 (2015).

Under N.J.R.E. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Under N.J.R.E. 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Finally, under N.J.R.E. 701, lay witnesses may give "testimony in the form of opinions or inferences . . . if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue."

Detective Stevens did not give any expert or lay opinion testimony. Rather, he gave fact testimony about the contents of the financial records. Another witness, Cristiano, from Morgan Stanley, gave testimony similar to that

of Detective Stevens, testifying to the dates and amounts of numerous withdrawals made from the Sherengo trust account. Defendant did not object to Cristiano's testimony.

Detective Stevens's testimony did not become expert testimony merely because he performed simple mathematical calculations, totaling the amounts defendant had withdrawn from various client accounts and deposited in his own accounts. N.J.R.E. 1006 ("The contents of voluminous writings or photographs which cannot conveniently be examined in court may be presented by a qualified witness in the form of a chart, summary, or calculation. . . .") (emphasis added). Indeed, Gary Matarazzo gave similar testimony as to the dates and amounts of payments he made to defendant, giving a rough total of those amounts. Defendant did not object to Matarazzo's testimony.

This case is distinguishable from the cases where witnesses were improperly permitted to give opinion testimony that intruded upon the function of the jury. See, e.g., State v. McLean, 205 N.J. 438, 443, 461 (2011) (holding that police officers may not testify to their opinion that they observed a drug transaction); State v. Hyman, 451 N.J. Super. 429, 446-52 (App. Div. 2017) (holding that trial court erred in permitting detective to provide opinion

testimony regarding the meaning of slang words without being qualified as expert, but error was harmless), certif. denied, 232 N.J. 301 (2018).

Detective Stevens issued no conclusions or opinions. He merely testified to the results of his investigation into defendant's accounts, including amounts taken from client accounts and deposited into defendant's accounts, and the amounts defendant reported as income. He gave no conclusions or opinions about the legality of defendant's withdrawals from the various accounts, nor did he make any conclusion about the legality of defendant's reported income on his tax returns. Thus, there was no intrusion upon the jury's function, nor any violation of the evidentiary rules governing lay opinion or expert testimony.

II.

We reject defendant's argument that the court denied him due process by failing to excuse non-English speakers during the jury selection process. The record is insufficient to show any error by the court, and defendant has not shown that any non-English speakers sat as jurors.

We also reject defendant's argument that he was deprived of due process because the court permitted the State to introduce excerpts from his statements to the OAE, notwithstanding that the State provided late discovery of these statements and its intent to use them.

A-3594-17T2

Utilizing an abuse of discretion standard for evidentiary determinations, we find none. The record reflects the State produced discovery to defendant before trial and moved in limine to admit defendant's recorded statements to the OAE. The court held a hearing and heard testimony from Isabel McGinty of the OAE. McGinty stated that as part of the OAE investigation, she conducted seven recorded interviews with defendant.

McGinty testified defendant had the right to discovery with respect to the ethics complaint, including copies of the interviews. However, it does not appear that defendant ever requested them, other than three transcripts his counsel requested on March 13, 2015, for interviews conducted June 10, 2013, February 20, 2015, and February 25, 2015.

Thereafter, defendant agreed to disbarment on June 23, 2015, and the court entered a disbarment order on July 13, 2015. The OAE referred the case to the Criminal Division on May 28, 2015, and provided the Criminal Division with certain documents related to the OAE investigation.

McGinty did not forward the tapes and transcripts of defendant's OAE interviews to the Deputy Attorney General until November 6, 2017. Immediately thereafter, the Deputy Attorney General provided this discovery to the defense. After hearing this evidence, and argument from counsel, the court

ruled on December 11, 2017, that defendant's statements to the OAE were admissible at trial because they were public record, not confidential, made voluntarily, and were statements against interest under N.J.R.E. 803(c)(25).

The admission of the statements did not violate defendant's due process rights as a result of their late disclosure in discovery, as excerpts of the transcripts had been produced by the State early in discovery. More importantly, defendant knew about all of his OAE interviews and had received transcripts of three of the interviews during the OAE process. Therefore, defendant was not surprised by the existence of the interviews.

While there was some delay in the State's obtaining the statements from the OAE and producing them to defendant for use in the criminal case, the State produced the statements to defendant immediately upon receiving them, and, after redactions, the State intended to use only 100 minutes of the statements, which was not voluminous, and counsel had sufficient time to prepare. This record reflects no denial of due process.

## III.

We similarly reject defendant's contention that his convictions of the theft charges were not supported by the evidence because the State failed to provide any proof that his fees were unreasonable for the services rendered.

A-3594-17T2

Before the case was sent to the jury, defendant moved for a judgment of acquittal. R. 3:18-1. As part of that motion, he argued broadly that the evidence was insufficient to support a conviction for any count of the indictment, which the prosecutor contested and the court rejected. Notably however, defendant did not argue that expert testimony was necessary to establish the value of his professional services.

In summation, defense counsel argued the evidence was insufficient to prove defendant's guilt of the charged offenses, because the State had not produced any evidence as to the reasonable value of the services he provided to his clients. Through its verdict, the jury rejected this argument.

Post-verdict, defendant made a motion for a new trial, in which he argued that evidence as to his reasonable attorney fees was necessary to prove his guilt. R. 3:18-2. The prosecutor addressed this contention, arguing: it was not obligated to present testimony regarding the reasonableness of defendant's attorney fees; the evidence was sufficient for the jury to have found theft; and the jury clearly made its own determinations, finding defendant guilty of only a third-degree crime as to Pasinosky, and finding him not guilty on one count as to the Matarazzo estate. In denying the motion, the court rejected defendant's

33

argument and agreed with the State's finding that the evidence was sufficient to support the jury's verdict.

On a motion for judgment of acquittal, made before the case is sent to the jury, Rule 3:18-1, or after a verdict has been rendered, Rule 3:18-2, the court is tasked with determining

> whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. D.A., 191 N.J. 158, 163 (2007); State v. Reyes, 50 N.J. 454, 458-59 (1967).]

The court "is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974). Accord State v. Zembreski, 445 N.J. Super. 412, 431 (App. Div. 2016).

Moreover, "[n]o distinction is made between direct and circumstantial evidence." State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011). See also State v. Dancyger, 29 N.J. 76, 84 (1959) (stating that a criminal conviction may be based solely upon circumstantial evidence). Indeed, juries are permitted to draw an inference from a fact whenever it is more probable than not that the

inference is true; the veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference.  Nevertheless, the State's right to the benefit of reasonable inferences should not be used to shift or lighten the burden of proof, or become a bootstrap to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt.  State v. Brown, 80 N.J. 587, 592 (1979) (citations omitted).

On appeal from a decision on a motion for judgment of acquittal, we apply the same legal standard as the trial court, performing a de novo review of the evidence.  State v. Fuqua, 234 N.J. 583, 590 (2018); State v. Dekowski, 218 N.J. 596, 608 (2014).

Defendant was in a confidential, fiduciary relationship with each of the named clients; he represented that his billing rate was $350 per hour; he took enormous amounts of money from the client accounts and deposited them into his own (over $90,000 from Pasinosky; over $400,000 from Sherengo; over $300,000 from Colavito; over $300,000 from Matarazzo; and over $400,000 from Zaccaria);[2] and the amounts taken occurred at suspicious times, or in frequent succession, and in suspiciously round numbers.

---

[2]  $300,000 in legal fees, at $350 per hour, would amount to 857 hours of work. $400,000 in legal fees, at $350 per hour, would amount to 1142 hours of work.

Defendant created no records of the work he performed; the clients did not receive bills detailing the work performed, nor any accountings of the estates at issue; he never obtained consent to take counsel fees directly from the client accounts; he discouraged inquiries into his practices, and discouraged outside review of the client's accounts; and on his taxes he reported less in income than he took from the various accounts. The jury was entitled to infer from this evidence that defendant had the requisite criminal intent to steal his clients' money. State v. Williams, 190 N.J. 114, 125-26 (2007); State v. Bzura, 261 N.J. Super. 602, 616 (App. Div. 1993).

Finally, as to Matarazzo and Pasinosky, against whom defendant was charged with theft by deception, the record includes evidence of defendant's theft of the client's money through deceit, N.J.S.A. 2C:20-4. Specifically, he misrepresented that the amounts he requested were for legal fees; presented himself as a named co-executor of the Pasinosky estate, discouraged John Pasinosky from seeking independent advice from his uncle's accountant; and represented that he could handle the Matarazzo estate but did not advise Gary

However, there was no indication that defendant spent that amount of time on the relevant client accounts.

A-3594-17T2

Matarazzo that he was not admitted to practice in New York, the location of the estate.

Although expert testimony is sometimes required, for example, to establish a standard of care in professional malpractice cases, or the fair settlement value of a legal claim, see, e.g., Kelly v. Berlin, 300 N.J. Super. 256, 264-66, 269-70 (App. Div. 1997), expert testimony was not necessary to prove defendant's guilt of the crimes charged.

In the Pasinosky matter, where there was more evidence as to the work defendant performed, and where defendant belatedly provided John with a certification of services rendered, the jury concluded that the amount stolen from Pasinosky was less than $75,000 (the State alleged it was over $90,000), thus reducing his crime from a second-degree charge to a third-degree offense.

Defendant argues the jury's verdict is inconsistent with respect to the crimes against the Matarazzo estate (counts eleven, twelve, and thirteen). Specifically, he argues that his acquittal on count twelve (second-degree theft by failure to make the required disposition of property, N.J.S.A. 2C:20-9) "barred" his convictions on counts eleven (second-degree theft by deception, N.J.S.A. 2C:20-4) and thirteen (second-degree misapplication of entrusted property, N.J.S.A. 2C:21-15). Therefore, he asserts the court erred by denying

his motion to dismiss counts eleven and thirteen. Having reviewed the record, we consider this argument to be without merit.

Contrary to defendant's argument, verdicts do not need to be consistent. State v. Muhammad, 182 N.J. 551, 578 (2005). Courts are not permitted to "conjecture regarding the nature of the deliberations in the jury room," or "speculate whether verdicts resulted from jury lenity, mistake, or compromise," nor do they "attempt to reconcile the counts on which the jury returned a verdict of guilty and not guilty." Ibid. Instead, courts "determine whether the evidence in the record was sufficient to support a conviction on any count on which the jury found the defendant guilty." Ibid. Accord State v. Goodwin, 224 N.J. 102, 116 (2016); State v. Terrell, 452 N.J. Super. 226, 269 (App. Div. 2016), aff'd, 231 N.J. 170 (2017).

Here, as to the Matarazzo estate, the record supports defendant's convictions for count eleven, second-degree theft by deception, and count thirteen, second-degree misapplication of entrusted property. Therefore, the court correctly denied defendant's motion to dismiss his convictions on these counts.

IV.

Defendant further contends the court erred by failing to dismiss the Pasinosky related offenses of theft by deception and misapplication of entrusted property, which occurred prior to Pasinosky's death, because the acts were beyond the five-year statute of limitations, N.J.S.A. 2C:1-6(b)(1).

A court should not dismiss an indictment unless it is manifestly deficient or defective. State v. Twiggs, 233 N.J. 513, 531-32 (2018). In general, we apply an abuse of discretion standard when reviewing a trial court's decision on a motion to dismiss an indictment, but where that decision involves a purely legal question, our review is de novo. Id. at 532. Accord State v. Bernardi, 456 N.J. Super. 176, 186 (App. Div. 2018) (reviewing decision to dismiss count of indictment de novo because it presented question of law).

"A criminal statute of limitations is designed to protect individuals from charges when the basic facts have become obscured by time." State v. Diorio, 216 N.J. 598, 612 (2014). It "balances the right of the public to have persons who commit criminal offenses charged, tried, and sanctioned with the right of the defendant to a prompt prosecution." Ibid. It serves as a complete bar to prosecution. Id. at 613.

As it relates to the date of accrual for a statute of limitations, N.J.S.A. 2C:1-6(c) states, in pertinent part:

> An offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated. Time starts to run on the day after the offense is committed. . . .

Thus, for continuing offenses, defined as "conduct spanning an extended period of time," which "generates harm that continues uninterrupted until the course of conduct ceases," Diorio, 216 N.J. at 614, the statute of limitations "does not begin to run until the prohibited conduct ceases." Id. at 602. By contrast, a discrete act "is one that occurs at a single point in time." Id. at 614.

In Diorio, the Court concluded that "most theft by deception offenses are not continuing offenses," noting that "the Legislature has declared that the various theft offenses addressed in Chapter 20, N.J.S.A. 2C:20-1 to -38 are generally single offenses. N.J.S.A. 2C:20-2(a)." Id. at 618. Nevertheless, the Court concluded that theft by deception may sometimes be a continuing offense. Ibid. In this regard, the Court noted that N.J.S.A. 2C:20-2(b)(4) explicitly permits the aggregation of amounts stolen to determine the grade of the offense, thus reflecting the Legislature's "recognition . . . that theft by deception is not always an isolated event but may actually be a complex scheme involving many

persons or businesses and play out over the course of many days, weeks, months, or even years." Ibid. The Court held: "when a defendant engages in a course of conduct or single scheme to obtain property of another by deception from one or several persons, that conduct is a continuous offense for purposes of the statute of limitations." Id. at 619. The Court applied the same reasoning to hold that money laundering, N.J.S.A. 2C:21-25(b), constitutes a continuing offense "when the record contains evidence of successive acts that facilitate and promote the common scheme to defraud." Id. at 622-25.

In rejecting defendant's motions to dismiss the original indictment, and the superseding indictment, the court held that defendant's theft from Pasinosky and the Pasinosky estate, which occurred through regular money transfers between November 3, 2008, and November 12, 2010, constituted a continuing violation because they were part of a single scheme to defraud the victims of their money. Therefore, the statute of limitations did not bar prosecution, because the indictment was within the five-year statute of limitations period based upon the date of the last transaction. The court acknowledged defendant's argument that Pasinosky and his estate were two separate victims. However, it found no significance in that fact, and neither do we.

## V.

Finally, we reject defendant's sentencing arguments. Defendant argues that his sentence should be reversed as excessive, based upon the overall number of consecutive sentences imposed, and the imposition of a consecutive sentence for the tax fraud convictions.

On March 29, 2018, the court held a sentencing hearing and entered a judgment of conviction. The court found that merger of offenses was applicable as to each victim, but only for the counts of theft by failure to make the required disposition and misapplication of entrusted property. Therefore, the court merged: counts three and four; counts six and seven; and counts nine and ten.

The court found aggravating factors two, four, nine, ten, and twelve, N.J.S.A. 2C:44-1(a)(2), (4), (9), (10), and (12) and mitigating factors seven and eight, N.J.S.A. 2C:44-1(b)(7) and (8). It did not weigh the mitigating factors heavily, and found that the aggravating factors substantially outweighed the mitigating factors.

The court made specific findings under State v. Yarbough, 100 N.J. 627 (1985), and determined that consecutive sentences were appropriate for the groups of crimes against separate victims. The court noted in particular that "the crimes committed by the defendant against six separate victims were

42

independent of each other, and also separate and distinct schemes" and they continued over an eleven-year period. The court concluded: "The defendant committed multiple offenses against multiple individuals and, therefore, consecutive sentences are appropriate in this case."

Ultimately, the court sentenced defendant to a total of twenty-six years, as follows: (1) five years each on counts two and three, to run concurrently with each other but consecutive to the sentences for counts five and six; (2) five years each on counts five and six, to run concurrently with each other, but consecutive to the sentences for counts eight and nine; (3) five years each on counts eight and nine, to run concurrently with each other, but consecutive to the sentences for counts eleven and thirteen; (4) five years each on counts eleven and thirteen, to run concurrently with one another, but consecutive to the sentences on counts fourteen and fifteen; (5) three years each on counts fourteen and fifteen, to run concurrently with one another, but consecutive to the sentences on counts sixteen, seventeen, eighteen, and nineteen; and (6) three years each on counts sixteen, seventeen, eighteen, and nineteen, to run concurrently with one another, but consecutive to the other terms.

We review the trial court's sentencing decision for an abuse of discretion. State v. Miller, 237 N.J. 15, 28 (2019); State v. Case, 220 N.J. 49, 65 (2014).

Here, the sentence imposed upon defendant is consistent with the law and does not shock the conscience. Notwithstanding the court's finding that the aggravating factors substantially outweighed the mitigating factors, the five-year sentences on the second-degree offenses are the lowest possible under our sentencing scheme, N.J.S.A. 2C:43-6(a)(2), as are the three-year sentences on the third-degree offenses, N.J.S.A. 2C:43-6(a)(3).

Moreover, the consecutive sentences are consistent with Yarbough, because defendant's crimes had separate victims and they continued for so many years. Furthermore, although defendant's overall sentence is twenty-six years, none of the crimes for which he was convicted carry periods of parole ineligibility. Therefore, the real-time consequences of his sentence are not as severe as appears from the overall length of the sentence. See State v. Marinez, 370 N.J. Super. 49, 53, 58 (App. Div. 2004) (considering real-time consequences of sentence as to which No Early Release Act, N.J.S.A. 2C:43-7.2, was applicable).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3594-17T2